IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| TERRY H. FULLWILEY,<br><br>Plaintiff,<br><br><br><br>vs.<br><br><br>UNION PACIFIC CORP., a Utah Corporation, and UNION PACIFIC RAILROAD COMPANY, a Delaware Corporation,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br><br><br><br>Case No. 2:04-CV-671 TS |

This matter came before the Court for hearing on Defendants'[1] Motion for Summary Judgment on January 10, 2006.  The Court heard oral argument of counsel and took the matter under advisement.  The Court, having fully considered the parties' briefs, submitted documentary evidence, relevant statute and case law, oral argument, and being otherwise fully informed, will grant the Motion and dismiss this case for the reasons set forth fully below.

---

[1] The Court refers herein to Defendants collectively as "Union Pacific."

1

<u>DISCUSSION</u>

Plaintiff's Amended Complaint alleges three causes of action: 1) hostile work environment under 42 U.S.C. § 1981; 2) negligent infliction of emotional distress under the Federal Employer's Liability Act (FELA); and 3) intentional infliction of emotional distress.

I.    <span style="font-variant: small-caps">Summary Judgment Standard</span>

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[2]  In reviewing the record, the Court views the evidence and draws any inferences therefrom in the light most favorable to the party opposing summary judgment.[3]  The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[4]   Accepting all of the facts in the light most favorable to Plaintiff as the non-moving party, the Court finds as follows.

II.   <span style="font-variant: small-caps">Hostile Work Environment under 42 U.S.C. § 1981</span>

At the outset, the Court notes that this racial discrimination/hostile work environment claim is *not* brought pursuant to Title VII but, rather, pursuant to 42 U.S.C. § 1981.  This

---

[2] Fed. R. Civ. P. 56(c), *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[3] *Coosewoon v. Meridian Oil Co.*, 25 F.3d 920, 929 (10th Cir. 1994).

[4] *Bingaman v. Kansas City Power & Light Co.*, 1 F.3d 976, 980 (10th Cir. 1993)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

becomes an important distinction in relation to the applicable statute of limitations and the limitation of the scope of conduct the Court is to consider.

A. Elements

The Tenth Circuit has established that in order to establish a *prima facie* case of hostile work environment harassment under § 1981, a plaintiff must show that "under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus."[5]

1.   Pervasive or severe harassment

Under this first prong, the Tenth Circuit has held that a showing of pervasiveness requires "more than a few isolated incidents of racial enmity."[6]  Further, a plaintiff must produce evidence to show that the workplace was "permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment."[7]

"Pervasiveness and severity are independent and equal grounds on which to support violations of § 1981."[8]  Under the pervasiveness standard, "plaintiff must show more than a few isolated incidents of racial enmity.  Instead of sporadic racial slurs, there must be a steady barrage

---

[5] *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998).

[6] *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) (citations and internal quotations omitted).

[7] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (alterations in original).

[8] *Witt*, 126 F.3d at 1432 (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) and *Smith v. Norwest Financial Acceptance, Inc.*, 129 F.3d 1408, 1413 (10th Cir. 1997)).

of opprobrious racial comments."[9]  Under the severity standard, a plaintiff "must demonstrate that the harassment was severe under both an objective and subjective component."[10]

>        2.    Racial animus

As noted above, as part of his *prima facie* case, Plaintiff must show that alleged "harassment was racial or stemmed from racial animus."[11]

>    B. Statute of Limitations and the "Continuing Violation" Doctrine.

28 U.S.C. § 1658 dictates a four-year statute of limitations for any "civil action arising under an Act of Congress" after December 1, 1990, including the statute at issue here, § 1981. The Supreme Court has held that generally, claims brought under 42 U.S.C. § 1981 are governed by the four-year federal statute of limitations found in 28 U.S.C. § 1658.[12]  As such, and for reasons more fully set forth below, the Court finds that the four-year limitations period set forth in § 1658 applies to this § 1981 case.  However, the key issue remains whether the Court is limited to conduct that occurred within the applicable four-year limitations period, or whether it can consider conduct outside of that period, pursuant to *National Railroad Pass. Corp. v. Morgan*.[13]

---

[9] *Id*. (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 286 (1994) and *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1412-13 (10th Cir. 1987)).

[10] *Id*. (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993)).

[11] *Id*.

[12] *See Jones v. R.R. Donnelly & Song Co.*, 541 U.S. 369, 382-83 (2004).

[13] 536 U.S. 101, 117 (2002).

Plaintiff argues that the "continuing violation theory" set forth by the Supreme Court in *Morgan* – which allows a court to review alleged hostile work environment acts occurring outside the otherwise-applicable limitations period, so long as at least one contributing act falls within the statutory period – applies to this § 1981 claim.  The Court finds that *Morgan* does not apply here and Plaintiff's claims are limited, both temporally and in scope, by the four-year limitations period set forth in § 1658.

*Morgan* itself is a Title VII case, *not* a § 1981 case.  Plaintiff can cite no binding case in which the Supreme Court or Tenth Circuit has expressly extended the "continuing violation" doctrine to § 1981 cases.  In fact, the cases that follow hold the opposite.  Plaintiff's strongest case is the Tenth Circuit's unpublished 2004 *Mitchell* case[14] dealing with a § 1981 hostile work environment claim wherein the Court implied, without further discussion, that the "continuing violation" doctrine applied in that case.  The *Mitchell* court stated, in what amounts to dicta, "[w]e review all of Mitchell's allegations, both prior and subsequent to the claim, as he has alleged at least one act contributing to that hostile environment within the statutory time period."[15]  The *Mitchell* court did not decide the case on the merits of the § 1981 hostile work environment claim but, rather, found there was no municipal liability, so did not further discuss *Morgan*'s applicability.  This passing reference to *Morgan* is troubling because, just prior to it, the Court referenced § 1981's four-year state of limitations, and in footnote nine, stated that "[t]he [state statute of limitations] applies to claims under § 1981(a), while the four year statute

---

[14] *Mitchell v. City and County of Denver*, 112 Fed.Appx. 662 (10th Cir. 2004).

[15] *Id.* at 671 (citing *Morgan*, 536 U.S. at 117-18).

5

of limitations, 28 U.S.C. § 1658, applies to claims falling under § 1981(b) – the source of Mitchell's claim."[16]  The claim in *Mitchell* was also a hostile work environment claim brought pursuant to § 1981, as is the case here.  *Mitchell* is an unpublished opinion and, thus, is non-binding precedent.[17]

In *Harris v. Allstate Insurance Co.*,[18] a published post-*Morgan* case, the Tenth Circuit expressly stated that "the continuing violation theory is not applicable to § 1981 claims."  The Court finds significant the *Harris* court's language that the "continuing violation *theory*" did not apply, not limiting its holding to just the applicable limitations period.  In support of this statement, the Court cited the pre-*Morgan* Tenth Circuit case *Thomas v. Denny's Inc.*[19]  *Thomas*, although it pre-dated *Morgan*, is instructive in that the Tenth Circuit explained the distinction between Title VII claims and those brought pursuant to § 1981 as follows: "because the continuing violation theory is a creature of the need to file administrative charges [as in a Title VII claim], and because a section 1981 claim does not require filing such charges before a judicial action may be brought, *the continuing violation theory is simply not applicable*."[20]  The Court finds this distinction key.

---

[16] *Id*. at 671 n.9.

[17] *See* 10th Cir. Rule 36.3(A).

[18] 300 F.3d 1183, 1193 n.2 (10th Cir. 2002).

[19] 111 F3d 1506, 1514 (10th Cir. 1997).

[20] *Id*. (emphasis added).

Plaintiff's reading of *Morgan* as extending to § 1981 claims would defeat the otherwise-applicable requirement that a plaintiff exhaust his or her administrative remedies in order to "qualify" for the more broad treatment of the "continuing violation" doctrine.  Such a reading would also essentially obliterate the distinction between hostile work environment claims brought pursuant to Title VII, as opposed to § 1981.  As the Tenth Circuit discussed in *Thomas*,[21] § 1981 does not require exhaustion of administrative remedies and is, thus, more limited in its scope regarding a limitations period.  The application Plaintiff urges would amount to an "end-run" around administrative exhaustion.

This becomes very relevant in the case at hand, because the bulk of Plaintiff's case here occurred before the applicable four-year limitations period.  Further, eight of the nine comments or incidents within the limitations period, as discussed below, were not reported by Plaintiff, which further strengthens the Court's belief that Plaintiff is attempting to litigate claims which were not exhausted as would be required in order to avail himself of the "continuing violation" doctrine.  Plaintiff could have and should have reported these incidents, but chose not to, for whatever reason.  *Morgan* does not save him from the consequences of that decision in this context.

Further, the Supreme Court, two years after *Morgan*, reiterated that a hostile work environment racial discrimination claim brought under § 1981 is governed by the federal "catch-all" four-year statute of limitations found in § 1658.[22]  Finally, the Court finds instructive,

---

[21] 111 F.3d at 1514.

[22] *Jones*, 541 U.S. at 383.

7

although non-binding, the holding in *Ware v. Union Pacific Railroad Company Omaha*.[23]  In *Ware*, the district court stated that "Plaintiff's claims arise under Section 1981(b) because they relate only to defendant's conduct after the formation of plaintiff's employment contract with defendant.  Accordingly, plaintiff's claims are subject to the four-year statute of limitations in Section 1658"[24] and, more to the point, "Defendant correctly responds that *the Tenth Circuit does not apply the continuing violation theory to causes of action arising under Section 1981*."[25]

In sum, the binding and relevant case law establishes that the *Morgan* "continuing violation" doctrine does *not* apply to § 1981 hostile work environment cases.  As such, this case is significantly narrowed to the nine statements identified in "Chart A" of Union Pacific's reply memorandum.[26]  Looking only at those nine statements which are allowed as a matter of law within the four-year limitations period, Plaintiff cannot meet his burden of establishing a *prima facie* case of hostile work environment.

     C.     <u>Plaintiff's Claims</u>.

It is not disputed that, within the applicable four-year limitations period, Plaintiff has only alleged nine comments and/or incidents in support of his hostile work environment claim.   The Court will address each of the nine comments/incidents individually, viewing the evidence in the light most favorable to Plaintiff.

---

[23] 278 F.Supp.2d 1263 (D. Kan. 2003).

[24] *Id*. at 1267 (internal citations omitted).

[25] *Id*. (emphasis added) (citing *Harris*, 300 F.3d at 1193).

[26] Defendant's reply memorandum at *v*.

     1.    <u>Allegations of adultery</u>.

Plaintiff testified in his deposition that a co-worker[27] confronted Plaintiff about his suspicions that the co-worker's wife was having an affair with a train engineer named Terry.[28] Plaintiff is an engineer and his first name is Terry.  Plaintiff himself testified that it was he who brought up the issue of race, asking the co-worker if the alleged adulterer was a "black guy."[29] Also, regarding the alleged threat, Plaintiff testified that the co-worker stated that if he had caught them (his wife and the man allegedly having an affair with her), he would have killed them both.

First, the Court finds that this incident was not racial in nature but, rather, involved strong feelings about possible adultery.  To believe that this incident was racial in nature, a jury would have to assume that the co-worker's only concern with his wife's alleged adultery was that the affair was being conducted with an African-American.  Such a conclusion is irrational and not supported by the evidence.  As such, a reasonable jury could not find that the incident "stemmed from racial animus," as is required under the second prong[30] of this hostile work environment claim.  Second, and alternatively, even if there were racial overtones to the incident, there was a police investigation into the matter, and there were no further problems.  The Tenth Circuit has held that, "[a]n employer is absolved of liability for acts of harassment by its employees if it

---

[27] Due to the sensitive nature of this allegation, the Court will not refer to the name of the co-worker.

[28] Plaintiff's deposition at 379-383.

[29] *Id.* at 379-83.

[30] *Witt*, 136 F.3d at 1432.

undertakes remedial and preventative action 'reasonably calculated to end the harassment.'"[31] Therefore, there were adequate remedial actions taken which also preclude this claim.

        2.    <u>Rumor re: slavery being a good thing</u>.

In about 2000, Plaintiff allegedly heard from a black employee named Clint Copeland that a co-employee named Corbett once told another employee that slavery was a good thing.[32]  It is undisputed that Plaintiff did not hear this remark himself, but only second-hand.  Plaintiff did not personally witness, hear, or experience any of these statements, and they were not directed at him.  It is also undisputed that Plaintiff never reported the incident.[33]

The Tenth Circuit has held that "[a] third party's description of [a witness'] supposed testimony is not suitable grist for the summary judgment mill."[34]  As such, this statement is inadmissible and does not constitute legally sufficient grounds to support Plaintiff's claim.

However, even if the statement were found to be admissible, the Court finds that it is legally insufficient as the comment was not directed at Plaintiff, nor was it heard by him.  As such, the comment does not constitute part of a "steady barrage" of opprobrious racial conduct necessary to make out the first prong of Plaintiff's claim.[35]

---

[31]  *Duncan v. Manager, Department of Safety, City and County of Denver*, 397 F.3d 1300, 1310 (10th Cir. 2005) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664 (10th Cir. 1998)).

[32] Plaintiff deposition at 443-44.

[33] *Id.* at 366.

[34] *Gross v. Burggraf*, 53 F.3d 1531, 1541 (10th Cir. 1995) (citations omitted) (affirming summary judgment for employer).

[35] *See e.g. Witt*, 136 F.3d 1424, 1432-33 (where comments were not directed at plaintiff, they were found to be even less likely to meet objective severity standard under first prong of §

      3.     "It doesn't read like that, boy" comment.

Plaintiff testified in his deposition that he and two co-workers were reading a rule book when one of them, J.D. Smith, disagreed with Plaintiff's interpretation and said to Plaintiff, "[i]t doesn't read like that, boy."[36]  Plaintiff further testified that he did not report the incident and that he had no further problems with J.D. Smith.[37]  There is nothing before the Court upon which to impute actual or constructive knowledge upon Union Pacific to establish liability.

However, even considering the statement against Union Pacific, the Court acknowledges that reference to the word "boy" may be considered to be inappropriate in the workplace.  Even so, "[t]he mere utterance of a statement which 'engenders offensive feelings in an employee' would not affect the conditions of employment to [a] significant degree" to establish Plaintiff's claim, and this comment is legally insufficient to support the first prong of the analysis.[38]

      4.     Plaintiff forced to sit in the back seat; co-employees laugh.

Sometime after 2000, Plaintiff was returning with a group of co-workers from Elko, Nevada in a van.  The front of the van was full when Plaintiff boarded, and he was told by a co-worker that he would have to take the back seat and everybody laughed.[39]  Even if the Court were

---

1981 racial discrimination claim).

    [36] Plaintiff's deposition at 253-54.

    [37] *Id.* at 255.

    [38] *Witt*, 136 F.3d at 1433 (quoting *Gross*, 53 F.3d at 1537) (other internal citations omitted).

    [39] Plaintiff testified at his deposition as follows: "I went to get in, and everybody was towards the front of the bus.  And Tim Mahone made this comment.  And he said, "Well, Terry, you know, look [sic] like you have to ride in the back of the bus. . . .  Everybody was laughing

to overlay the historical and racial implication Plaintiff urges, it finds that, as in *Witt* and *Gross* discussed above, Plaintiff's own subjective offense to an incident is not enough to meet the first prong.  The Court does not find it reasonable to make the leap from the fact of a fully occupied van to a finding of the racial animus and alteration of terms, conditions, or privileges of employment, which would be required for Plaintiff to meet his burden.  Further, it is undisputed that no racial terms were used in this incident.  Even though Plaintiff testified that he was offended,[40] he never complained or otherwise reported the incident to Union Pacific.  Further, Plaintiff testified that he did not complain of this incident to anyone.[41]  As a matter of law, then, Plaintiff cannot argue that Union Pacific had actual knowledge of the incident, or that Union Pacific failed to properly remedy the situation.[42]

> 5.    Use of phrase "my main nigger" by van driver.

Some time between 2000 and 2002, Plaintiff was riding in a "crew bus" when the driver, who is white, mentioned that he was from "California and it was nothing for white guys to approach black guys, if they have a good camaraderie, and say, 'How you doing, my main nigger?'"[43]  Plaintiff testified that the driver "wanted to address me as his main nigger" and

---

and carrying on." Plaintiff's deposition at 628.

[40] *Id.*

[41] *Id.* at 660.

[42] *See Ford v. West*, 222 F.3d 767, 776 (10th Cir. 2000) ("[a] plaintiff demonstrates actual employer knowledge where the plaintiff has reported harassment to management-level employees.").

[43] Plaintiff's Deposition at 623.

"approached me with the attempt of saying, How is my main nigger doing?"[44]  This is the only incident Plaintiff can point to in the four-year limitations period where any racial epithet was even arguably directed at him.

When the driver made the comment, Plaintiff responded: "I told him that I'm not like that and I don't appreciate that type of talk."[45]  The comment was not repeated, and there were no further problems.  Further, Plaintiff testified that he did not complain of this incident to anyone.[46] As a matter of law, then, Plaintiff cannot argue that Union Pacific had actual knowledge of the incident, or that Union Pacific failed to properly remedy the situation.[47]

Importantly, the driver was not an employee of Union Pacific at the time of the incident.[48] While the Court finds that, as is discussed more fully below, Plaintiff has failed to make the connection between these allegedly discriminatory actions and the liability of Union Pacific, this incident is even further removed because the speaker was not a Union Pacific employee, and Plaintiff has presented no evidence or legal authority to the contrary.

---

[44] *Id.* at 660.

[45] *Id.* at 623.

[46] *Id.* at 660.

[47] *See Ford*, 222 F.3d at 776.

[48] Plaintiff's deposition at 623, 659.

6.      Rumors re: use of the n-word in reference to others.

In 2003 or 2004, Plaintiff heard second-hand that someone else had used the n-word in reference to another African-American, and that another African-American had been the subject of graffiti in which the n-word was used.

In the first incident, a white co-worker, Dick Wade, told Plaintiff that he was upset and offended that another unnamed white co-worker had used the n-word in reference to an African-American employee named Greg Scott.[49]  Plaintiff testified in his deposition that he was not present when the comment was made, and that he did not report it.[50]

The second incident involved graffiti in the men's restroom referencing an African-American co-worker named Terrence Frasier, including the language "most notorious n-----."[51]  Plaintiff testified that Mr. Frasier confronted the person who he thought had made the graffiti, and had reported it to a manager.[52]  Plaintiff further testified that he never saw the graffiti, and that he made no complaint.[53]

Neither of these statements involved Plaintiff, neither were directed at Plaintiff, Plaintiff did not hear or witness them, and Plaintiff has no personal knowledge of them, other than second-hand reports.  It is also undisputed that Plaintiff never reported either incident.  Further,

---

[49] *Id.* at 623-24, 658.

[50] *Id.* at 658.

[51] *Id.* at 634, 648.

[52] *Id.*

[53] *Id.* at 647-48.

14

Plaintiff testified that he did not complain of this incident to anyone.[54]  As a matter of law, then, Plaintiff cannot argue that Union Pacific had actual knowledge of the incident, or that Union Pacific failed to properly remedy the situation.[55]

As noted above, the Tenth Circuit has held that "[a] third party's description of [a witness'] supposed testimony is not suitable grist for the summary judgment mill."[56]  As such, these statements are inadmissible and do not constitute legally sufficient grounds to support Plaintiff's claim.  However, even if the statements were found to be admissible, the Court finds that they are legally insufficient as they were not directed at Plaintiff, nor were they even about him.  As such, they are even less likely to constitute part of a "steady barrage" of opprobrious racial conduct necessary to make out the first prong of Plaintiff's claim.[57]

       7.       Rumor re: Deadwood poster.

In 2004, Plaintiff was told by an African-American co-worker, Terrence Frasier, that an unnamed employee had posted a flyer for the television show "Deadwood" in the "register room or the switchmen shanty," and that Mr. Frasier found it to be offensive.[58]  Under the depiction of

---

[54] *Id.* at 660.

[55] *See Ford*, 222 F.3d at 776.

[56] *Gross*, 53 F.3d at 1541 (citations omitted) (affirming summary judgment for employer).

[57] *See e.g. Witt*, 136 F.3d at 1432-33 (where comments were not directed at plaintiff, they were found to be even less likely to meet objective severity standard under first prong of § 1981 racial discrimination claim).

[58] Plaintiff's deposition at 621.

the main character, someone had anonymously written "my hero."[59]  Plaintiff testified that he

considers the main character in "Deadwood" to be an "outright bigot."[60]  Plaintiff testified that he

only heard about the poster second-hand,[61] that he did not see the poster himself,[62] and that there

were no racial terms on the poster.[63]

There is nothing overtly racial about the poster at issue, and would require the Court to

speculate to reach the meaning urged by Plaintiff.  Further, it is undisputed that Plaintiff did not

complain of or report this incident.  Therefore, there is nothing before the Court upon which to

impute actual or constructive knowledge upon Union Pacific to establish liability.

As discussed in reference to other incidents, this was not directed at Plaintiff, nor does he

have personal knowledge of it and, as such, it is even less likely to constitute part of a "steady

barrage" of opprobrious racial conduct necessary to make out the first prong of Plaintiff's

claim.[64]  Although Plaintiff testified that he took offense to the poster (which he did not see), as

the Court has previously noted, "[t]he mere utterance of a statement which 'engenders offensive

feelings in an employee' would not affect the conditions of employment to [a] significant degree"

---

[59] *Id.*

[60] *Id.*

[61] *Id.* at 621, 661.

[62] *Id.* at 660.

[63] *Id.* at 661.

[64] *See Witt*, 136 F.3d at 1432-33.

16

to establish Plaintiff's claim,[65] and this incident is legally insufficient to support the first prong of the analysis.

8.    2002 White e-mail containing phrase "keep an eye on the slaves."

In 2002, a white co-worker named Charlie White "hacked" into the Union Pacific computer system and sent an e-mail to employees as if it came from the superintendent.  In the e-mail was the phrase, "keep an eye on the slaves," which Plaintiff takes to be a reference to this nation's history with slavery of African-Americans, and Defendant argues is a reference to the supervisor being on vacation, while the non-supervisory employees are "slaving away."  The e-mail was directed to a large group of all races, and was not directed at Plaintiff.  Plaintiff testified that white and black people were "upset" about the e-mail.[66]

It is undisputed, and Plaintiff expressly testified, that he did not see the 2002 e-mail until his attorneys showed it to him in their offices in 2004.  However, Plaintiff testified that he had the "opportunity to see it beforehand," but that he "just chose not to see it."[67]  Plaintiff's counsel argue, without citation to the record, that a co-worker came to Plaintiff with the e-mail in his hand and told him about it, although he did not read it.

There is no factual support in the record for Plaintiff's argument in his memorandum and at the hearing that he knew of the e-mail in 2002.  However, even assuming *arguendo* that he was aware of its existence in 2002, such awareness was brought about only through a second-

_____

[65] *Id.*, 136, F.3d at 1433 (quoting *Gross*, 53 F.3d at 1537) (other internal citations omitted).

[66] Plaintiff's deposition at 657.

[67] *Id.* at 657.

hand report, which faces the same evidentiary problems noted above.[68]  The only personal knowledge Plaintiff had of the e-mail came when his attorneys showed him a copy of the e-mail during the course of the instant litigation.[69]  Thus, Plaintiff was exposed to the e-mail in his lawyers' offices, not in his work environment.

The Court must review evidence supporting alleged hostile work environment claims in their proper context.[70]  As such, the Court believes that a reasonable jury could not find that a second-hand statement Plaintiff heard with regard to an e-mail he did not see until two years later in his attorneys' offices somehow establishes the existence of a hostile work environment. Further, the statement itself, viewed in its context, may or may not stem from a racial animus but, again assuming *arguendo* that it does, such an isolated event cannot rise to a "steady barrage" of incidents which would support the first prong of this analysis.  Finally, it is undisputed that Union Pacific terminated the writer of the e-mail, although apparently not for EEO reasons, and there were no further problems.  Therefore, any problem was remedied by the termination.

9.      "Rise and shine, sunshine" comment.

In 2005, a co-worker allegedly awoke Plaintiff and told him to "rise and shine, sunshine."[71]  Plaintiff has made no connection between the comment and any sort of racial animus, and the Court finds that a reasonable jury could not find that the comment "stemmed

---

[68] *See Gross*, 53 F.3d 15 1541.

[69] *See* Plaintiff's deposition at 657.

[70] *See Bolden*, 43. F.3d at 551.

[71] Plaintiff's deposition 620-21.

from racial animus."[72]  Therefore, this comment fails, as a matter of law, on the second prong of

the analysis.[73]  Further, it is undisputed that Plaintiff did not complain or otherwise report the

incident to Union Pacific.

    D. Conclusion.

        1. *Prima facie* case.

            a. Exclusion of inadmissible evidence.

The Court finds that it cannot consider all of the statements or incidents above, for

various reasons set forth herein.  Specifically, the following six statements or incidents are not

appropriate in this summary judgment context and will not be considered by the Court.

Racial animus.  Two of the allegations – the comment "rise and shine, sunshine," and the

allegation of adultery – are not racial in nature and, thus, fail on the second prong under § 1983.

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could not find that

these incidents stemmed from a racial animus and, therefore, they cannot survive summary

judgment.

Third-party statements.  Three statements or "rumors" – rumor about a Deadwood poster

with the words "my hero" written beneath a character Plaintiff believes to be a bigot, rumors

about the use of the n-word used in reference to a co-worker, and a rumor that an employee once

said slavery was a good thing – are not admissible.  Plaintiff has no actual knowledge of these

statements.  The Tenth Circuit has stated that

---

[72] *Witt*, 136 F.3d at 1432.

[73] *Id.*

> It is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment. Hearsay testimony cannot be considered because "[a] third party's description of [a witness'] supposed testimony is not suitable grist for the summary judgment mill."[74]

The *Gross* court went on to say that "evidence offered in opposition to a motion for summary judgment must be 'made on personal knowledge . . . set forth such facts as would be *admissible in evidence*, and . . . show affirmatively that the [person testifying] is competent to testify to the matters' set forth therein."[75]  Therefore, these comments may not appropriately be considered by the Court in this summary judgment context.

New paragraph <u>Incident not in environment</u>.  Finally, the 2002 e-mail containing the statement "keep an eye on the slaves," which Plaintiff received from his attorneys while in their offices in 2004 after the inception of this litigation, is not relevant evidence to be considered in support of Plaintiff's *prima facie* case.  Plaintiff did not receive this e-mail in his working environment and, thus, it cannot be attributed to an allegedly hostile work environment in that context.  To the extent that Plaintiff heard about the e-mail, it would be inadmissible as a third-party statement for the reasons set forth above.  Further, this incident was adequately remedied because Union Pacific fired the perpetrator and there were no further similar incidents.  The Tenth Circuit has held that, "[a]n employer is absolved of liability for acts of harassment by its employees if it undertakes

---

[74] *Gross*, 53 F.3d at 1541 (citing *Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir. 1995)) (other internal citations omitted).

[75] *Id.* (citing *H.B. Zachry Co. v. O'Brien*, 378 F.2d 423, 425 (10th Cir. 1967) (citations omitted)) (emphasis in original).

remedial and preventative action 'reasonably calculated to end the harassment.'"[76] The Court will not consider the 2002 e-mail in support of Plaintiff's *prima facie* case.

<u>Three remaining statements</u>.  That leaves only three statements – the use of the phrase "my main nigger" by a co-worker, Plaintiff having to sit in the back of a van and co-workers laughing, and J.D. Smith saying, "it doesn't read like that, boy" – for consideration in the context of this summary judgment motion.  The three remaining comments or incidents are not barred for the reasons stated above, but even viewing this evidence in the light most favorable to Plaintiff, they still cannot meet the first prong.

The first prong requires that the "workplace [be] permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment."[77]  To establish severity, Plaintiff "must demonstrate that the harassment was severe under both an objective and subjective component."  Under the pervasiveness test, "[i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments."[78]  These three comments over a roughly two-year period simply do not meet these standards.

The Court finds that those statements and incidents which can be appropriately considered by the Court are simply not enough, as a matter of law, to establish the *prima facie* elements of Plaintiff's claim, and summary judgment must issue.

---

[76]  *Duncan*, 397 F.3d at 1310 (citing *Adler*).

[77]  *Oncale*, 523 U.S. at 81.

[78]  *Bolden*, 43 F.3d at 551.

b.    Inclusion of all nine claims alternative.

The Court has identified various grounds upon which several or all of the statements or incidents above must be excluded from consideration, as a matter of law.  However, in the alternative, and for purposes of this summary judgment motion, the Court finds as a matter of law that, even considering all nine of them, Plaintiff has not established the *prima facie* elements of a hostile work environment claim under § 1981, as they collectively do not amount to the standard that "[i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments."[79]  Nine statements or incidents (and not all of those stem from a racial animus, as noted above) over a roughly five-year period simply do not rise to the required standard that there be a "steady barrage," as previously discussed.

The Tenth Circuit has affirmed the grant of summary judgment on cases with far more egregious racial incidents than those presented in this case.  In *Bolden*,[80] the plaintiff was subjected to the use of repeated racial phrases and symbols, and eventually a physical altercation.  Even considering racial allegations along with additional harassment and violence, the Tenth Circuit still concluded that the plaintiff did not present "evidence of a steady barrage of opprobrious racial comments, as required to show a racially hostile work environment," and affirmed summary judgment for the employer.[81]  Also, in *Witt*,[82] the Tenth Circuit found that a

---

[79] *Bolden*, 43 F.3d at 551.

[80] *Id*. at 549-51.

[81] *Id.* at 551.

[82] 136 F.3d at 1432.

case involving repeated use of the n-word and threats issued on "Ku Klux Klan" letterhead were not actionable.  Under this line of authority, and for the other reasons stated herein, Plaintiff's claims here within the four-year limitations period simply do not establish a hostile work environment claim under § 1981.

> 2.   Employer liability.

Plaintiff only reported one of the nine incidents (the incident alleging adultery), and the Court has found that that incident did not stem from a racial animus.  Further, adequate remedial actions were taken and there were no further problems, which preclude this claim.  As previously noted, the Tenth Circuit has held that, "[a]n employer is absolved of liability for acts of harassment by its employees if it undertakes remedial and preventative action 'reasonably calculated to end the harassment.'"[83]

It is undisputed that none of the other incidents were reported by Plaintiff.

Plaintiff cannot support his case on unreported and loosely drawn-together claims which, collectively, only tenuously bear any semblance to discriminatory behavior.   Plaintiff has failed to provide evidence that Union Pacific had notice that these allegedly racially discriminatory acts had occurred.[84]  As a matter of law, then, Plaintiff cannot argue that Union Pacific had knowledge of the incident, or that Union Pacific failed to properly remedy the situation.

Plaintiff has failed to meet his burden of establishing employer liability on any of these claims.  Reported claims (the incident alleging adultery was reported by Plaintiff, and the 2002 e-

---

[83] *Duncan*, 397 F.3d at 1310 (citing *Adler*).

[84] *See Ford*, 222 F.3d at 776.

23

mail was reported by another employee) were resolved with no further problems.  As a matter of law, even if Plaintiff could satisfy both prongs of the hostile work environment claim, which the Court has found he cannot as a matter of law, Plaintiff's first cause of action also fails on the lack of employer liability.

        3.    <u>Futility</u>.

The Court will briefly address Plaintiff's argument that he failed to report the statements and incidents at issue in this case because he felt it was futile from previous failed attempts to do so, prior to the relevant four-year limitations period.  Plaintiff argues that he just "gave up," and the history of his dealings with Union Pacific justified him doing so, and excuse him from not having reported the claims he now brings before the Court.  However, Plaintiff presents no case law to support this argument, or the proposition that the Court should look outside of the four-year limitations period at prior alleged failures by Union Pacific to adequately respond to incidents that are procedurally barred here.

The previously cited binding case law upon which the Court relies requires that the Court look only to incidents occurring within the four-year limitations period, and assess employer liability only to unremedied instances where Union Pacific had knowledge of the allegedly discriminatory behavior.  The Court declines to adopt Plaintiff's unsupported argument to excuse his nearly complete failure to report these incidents.

4.      Finding.

In sum, given the significant limiting of the four-year limitations period, Plaintiff has

failed to establish a *prima facie* case for hostile work environment under § 1981, and summary

judgment must issue against Plaintiff on his hostile work environment cause of action.

III.    NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS UNDER FELA

A. Elements

Plaintiff's second cause of action, Negligent Infliction of Emotional Distress under

FELA, arises under 45 U.S.C. § 51 (liability of common carriers by railroad, in interstate or

foreign commerce, for injuries to employees from negligence; employee defined).

Section 51 states, in relevant part, that

> Every common carrier by railroad while engaging in commerce . . .
> shall be liable in damages to any person suffering injury [or death]
> while he is employed by such carrier in such commerce . . . for
> such injury or death resulting in whole or in part from the
> negligence of any of the officers, agents, or employees of such
> carrier, or by reason of any defect or insufficiency, due to its
> negligence . . .

The Tenth Circuit has stated that the "focus of FELA is the negligence of the employer,

not the mere fact that injuries occur."[85]  The Supreme Court, in *Consolidated Rail*, held that an

employee may recover damages under FELA (§ 51) for mental or emotional injuries only where

the employee can show he was within a zone of danger of physical impact.[86]

---

[85] *Smith v. Union Pacific Railroad Co.*, 236 F.3d 1168, 1171 (10th Cir. 2000) ("the substance of [the] injury is the focus of our inquiry in determining whether the zone of danger test applies."); *see also Consolidated Rail v. Gottshall*, 512 U.S. 532 (1994).

[86] *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532 (1994).

The relevant test, then, is the "zone of danger."  The Supreme Court adopted the "zone of danger" test for actions brought pursuant to FELA, as follows:

> Under this test, a worker within the zone of danger of physical impact will be able to recover for emotional injury caused by fear of physical injury to himself, whereas a worker outside the zone will not.  Railroad employees thus will be able to recover for injuries – physical and emotional – caused by the negligent conduct of their employers that threatens them imminently with physical impact.[87]

 "Whether an employee's claim satisfied the zone of danger test is a legal question."[88]

Further, the Supreme Court has noted that, regarding injuries which constituted "mental or emotional harm (such as fright or anxiety) that [are] caused by the negligence of another and that [are] not directly brought about by a physical injury," substantial limitations must be placed "on the class of plaintiffs that may recover for emotional injuries and on the injuries that may be compensable."[89]

B. Analysis

By statute, a three-year statute of limitations imposed under FELA: "No action shall be maintained under this chapter unless commenced within three years from the day the cause of action accrued."[90]  The primary incidents Plaintiff points to in support of his FELA claim are the Peterson incident (1999, wherein Peterson "grabbed" Plaintiff by the shoulders) and the incident

---

[87] *Id.*, 512 U.S. at 556.

[88] *Smith*, 236 U.S. at 1170; *see also Consolidated Rail*, 512 U.S. at 546, 554.

[89] *Smith*, 236 F.3d at 1172 (quoting *Consolidated Rail*, 512 U.S. at 546) (other internal citations omitted).

[90] 45 U.S.C. § 56.

26

alleging adultery (2000, alleged threat that he would have "killed" Plaintiff he had caught him with his wife), which do not fall within the three-year limitations period beginning July 21, 2001. The Court finds, then, that those two incidents are not appropriately before the Court as a matter of law.

The Court is not persuaded by Plaintiff's argument that the limitations period should be tolled under a "continued negligence" analysis, as stated in the D.C. Circuit decision *National R.R. Passenger Corp. v. Krause*.[91]  Even so, that doctrine only tolls the time until a plaintiff knew or could have known of his injury and that its possible cause was work-related.  However, even if the Court were to extend *Krause* to this case, because Plaintiff was aware of his alleged injuries prior to the limitations period, the Court finds *Krause* unavailing.

It is somewhat disingenuous for Plaintiff to claim that he didn't realize until far later that the alleged "injuries" resulting from the above incidents were a result of the allegedly harassing behavior of Union Pacific, because Plaintiff asks the Court to impute constructive notice of the injuries to Union Pacific when he claims he didn't even know about them himself.  Further, Plaintiff reported the Peterson incident to Union Pacific in 1999, describing "ongoing anxiety" from the attack.  With regard to the 2000 incident alleging adultery, Plaintiff reported that incident to both Union Pacific and to the police.  This indicates that Plaintiff knew immediately of his alleged "injuries."  Therefore, it is inconsistent to argue that he didn't realize the injuries from these two events until within the limitations period.

---

[91] 627 A.2d 489, 495-96 (D.C. 1993).

Regarding any remaining alleged allegations for injury, the Court finds that Plaintiff has made no claim for physical injury, but states that he "has been diagnosed with generalized anxiety disorder and mild to moderate major depression, single episode."[92]  While emotional maladies may be considered under FELA, "[u]nder the zone of danger test, [plaintiff's] claim for his emotional injuries can survive only if he can show he was within the zone of danger of some physical impact."[93]  The *Consolidated Rail* case cited above noted that the "zone of danger" test imposes a "substantial limitation" on negligence claims necessary to guard against the danger of "nearly infinite and unpredictable liability for defendants."[94]

Plaintiff concedes in his opposition brief that it is apparent that the viability of his FELA claim depends upon whether the actual or threatened "physical impact" placed Plaintiff in reasonable apprehension of physical harm.  Even disregarding the statute of limitations for the sake of discussion, the alleged physical injuries – being grabbed by the shoulders or the alleged threat to kill him – are not enough.  The Supreme Court, after *Consolidated Rail*, explained that the term "physical impact" does "not encompass every form of physical contact."[95]  The only allegation of physical harm comes from the Peterson incident, and Plaintiff did not report that incident until seven months after the fact.  Further, in the complete reporting to police of the incident alleging adultery, Plaintiff didn't mention being in fear.  Taking that one step further, the

---

[92] Plaintiff's opposition at ¶ 31.

[93] *Smith v. Union Pacific Railroad*, 236 F.3d 1168, 1172 (10th Cir.  2000).

[94] 512 U.S. at 546.

[95] *Metro-North Commuter R.R. Co. v. Buckley*, 521 U.S. 424, 432 (1997).

more vague emotional injuries claimed by Plaintiff for his overall harassment cannot reasonably be said to have arisen from his being "within the zone of danger of some physical impact."[96]

The Court finds that the injuries alleged to have been suffered by Plaintiff in this case simply do not amount to injuries recoverable under FELA under the "zone of danger" test. Plaintiff has failed, as a matter of law, to articulate requisite injury caused by Union Pacific's negligence in this case.  Even notwithstanding the procedural bar imposed by the statute of limitations in this case, the Peterson incident and the incidents alleging adultery themselves are not severe enough to amount to an actionable FELA claim.  Therefore, as a matter of law, Plaintiff cannot recover on his second cause of action, and judgment as a matter of law must issue.

IV.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

A. Elements

In order to establish a claim for Intentional Infliction of Emotional Distress, Plaintiff must show (1) conduct that was outrageous and intolerable in that it offended generally accepted standards of decency and morality; (2) an intent to cause, or actions in reckless disregard of the likelihood of causing, emotional distress; (3) the plaintiff suffered severe emotional distress; and (4) the defendants' conduct proximately caused the emotional distress.[97]  The Utah Supreme Court has cast more light on the first prong as follows: In evaluating a claim for summary judgment for Intentional Infliction of Emotional Distress, "[a] court is to determine whether a

---

[96] *Smith*, 236 F.3d at 1172.

[97] *Prince v. Bear River Mut. Ins. Co.*, 56 F.3d 524, 535 (Utah 2002).

defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery" and "[o]utrageous conduct . . . is conduct that evokes outrage or revulsion; it must be more than unreasonable, unkind, or unfair.[98]"

B. Analysis

The Court first finds that FELA preempts this claim and, as such, the three-year statute of limitations applies.  Plaintiff has failed to allege incidents within the limitations period which meet the requirements to make out a claim for intentional infliction of emotional distress, as set forth below.  However, in the alternative, even if the Court were to apply Utah's four-year statute of limitations,[99] Plaintiff still fails to alleged incidents sufficient to prevail on this claim.

Viewing the evidence in the light most favorable to Plaintiff, the Court finds, as a matter of law, that a reasonable jury simply could not find that the conduct alleged by Plaintiff within the limitations period to be so outrageous and intolerable that it offended generally accepted standards of decency and morality.  The Court does not condone such conduct, but finds that it is more consistent with the "unreasonable, unkind, or unfair" conduct referenced by the Utah Supreme Court.  Having found that Plaintiff's claim fails on the first prong, the Court will not engage in the remaining analysis.

CONCLUSION

Based upon the above, it is hereby

---

[98] *Id*. at 536.

[99] U.C.A. § 78-12-25(3) (2005).

ORDERED that Defendants' Motion for Summary Judgment [Docket No. 156] is GRANTED as to each of the three causes of action alleged by Plaintiff in his Amended Complaint, and judgment shall be granted in favor of Defendants on all claims.  It is further

ORDERED that Plaintiff's Motion to Strike [Docket No. 153] is DENIED as moot.

The Clerk of Court is directed to close this case forthwith.

DATED  February 1, 2006.

BY THE COURT:

_____

TED STEWART
United States District Judge